IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

DEL EUGENE LANGE,                    §
                                     §
              Petitioner,            §
                                     §
VS.                                  §          CIVIL ACTION NO. H-07-3492
                                     §
NATHANIEL QUARTERMAN,                §
                                     §
              Respondent.            §

## MEMORANDUM AND OPINION

The petitioner, Del Eugene Lange, seeks habeas corpus relief under 28 U.S.C. § 2254, challenging a 2000 state felony conviction for aggravated sexual assault of a child. The respondent filed a motion for summary judgment, (Docket Entry No. 17), with a copy of the state court record. Lange, through counsel, filed a response. (Docket Entry No. 40). Based on careful consideration of the pleadings; the motion and response; the record; and the applicable law, this court grants the respondent's motion and, by separate order, enters final judgment. The reasons are set out below.

## I.    Background

A jury convicted Lange of the felony offense of aggravated sexual assault of a child. (Cause Number 26,664-361, 361st Judicial District Court of Brazos County, Texas). On March 7, 2000, the jury sentenced Lange to thirty-five years in prison. The Seventh Court of Appeals of Texas affirmed Lange's conviction on November 8, 2001. *Lange v. State*, No. 07-00-0348-CR, 57 S.W.3d 458 (Tex. App. – Amarillo 2001, pet. ref'd). On September 11, 2002, the Texas Court of Criminal Appeals refused Lange's petition for discretionary review. On December 10, 2003, Lange filed an application

for state habeas corpus relief.  On November 21, 2003, the Texas Court of Criminal Appeals denied the application without written order.  *Ex parte Lange,* Application No. 67,650-02 at cover.

Lange filed this federal habeas petition on October 23, 2007.  Lange contends that his conviction is void for the following reasons.

(1)     His trial counsel, Travis Bryan, III, rendered ineffective assistance by introducing evidence of an extraneous offense.

(2)     The prosecutor engaged in misconduct during closing argument by:

      a.     making an improper argument;

      b.     improperly "vouching"; and

      c.     arguing that defense counsel was distracting the jury from the truth.

(Docket Entry No. 1, Petition for Writ of Habeas Corpus, pp. 19, 23).

Each contention is examined below.

## II.     Background

The factual background is taken from the trial transcript.  On October 8, 1998, Nicole Lacowski, a physician's assistant in the Bryan, Texas office of Dr. John Hall, examined the complainant, A.L., a seven-year-old girl.  (Reporter's Record, Vol. V, pp. 61-72).  Amy Lange Koronka, the complainant's mother, had brought her to the doctor's office because of a rash and dark circles under her eyes.  (*Id.* at 65).  Lacowski testified at trial that the child appeared frightened and lethargic.  The complainant wrote Lacowski a note stating: "when, I was in kindergarten, I was at my dad's.  He stuck his finger up my tee-tee."  (*Id.* at  69).  Lacowski performed a pelvic exam on A.L. and determined that the child's hymen had been traumatized sometime in the past and the

vagina opening was larger than usual for a child of that age. (*Id*. at 70). Lacowski acknowledged that this could have resulted from a number of different causes. (*Id*. at 71-72).

Jane Riley, a pediatric nurse practitioner for Scotty's House, a child-advocacy center, performed a pelvic examination on the complainant on October 9, 1998. (*Id*. at 74, 76, 82). Riley observed a rash on the child's inner thighs and stomach, several bruises on her legs, and a yellow bruise on her chest. (*Id*. at 85). Riley examined the complainant's genital area and saw that the skin between the rectum and vagina was bleeding and irritated. (*Id*. at 86). Riley also observed that part of the hymen was worn away, a condition known as "attenuation." Riley believed that the attenuation was caused by repeated penetration, by something larger than a finger. (*Id*. at 87-88). On cross-examination, Riley conceded that this conclusion was inconsistent with the complainant's account of digital penetration. Riley also conceded that the bleeding could be consistent with recent sexual abuse. (*Id*. at 101, 102, 111). Riley examined three photographs – Defense Exhibits 3, 4, & 5 – taken during the pelvic examination of the complainant with a magnifying culposcope. Riley did not see any indication of labial adhesion, or "agglutination," in the photographs. (*Id*. at 111, 117). On redirect, Riley testified that the skin between the vagina and anus can bleed from irritation due to causes ranging from poor hygiene or tight jeans. Such bleeding, Riley acknowledged, does not necessarily show recent sexual abuse. (*Id*. at 143).

Gerald Kinard, a criminal investigator for the Brazos County Attorney's Office, was assigned to investigate A.L.'s case on October 9, 1998. (Reporter's Record, Vol. V, p. 148). Kinard interviewed Del Lange on October 13, 1998. Lange denied any inappropriate acts. Kinard questioned Lange about whether he had done anything that his daughter might have misinterpreted as a sexual act, such as applying medication to her genital area or washing her genitals. Lange

replied that he had not.  Lange repeatedly denied the allegations against him.  However, during a conversation with Kinard on October 16, 1998, Lange asked what he would have to say to get probation.   Kinard did not consider that statement to be a confession, but did consider it incriminating.  (Reporter's Record, Vol. V, pp. 148-49, 155).

The complainant, A.L., testified at trial via closed-circuit television.  At the time of trial, March 2000, the complainant was nine years old and a third grader.  She had an eleven-year-old brother and a seven-year-old sister.  (Reporter's Record, Vol. VI, pp. 12-13).  The complainant testified that her father first performed a sexual act on her when she was four or five years old.  The first incident occurred when she went into the house to get a cordless phone at her mother's request. (*Id.* at 15, 19).  Her mother, brother, and sister were outside.  Lange, her father, was in the bedroom. When A.L. went into the bedroom, Lange shut the door, told her to pull her pants down and lie on the bed, and then "just stuck his finger up my privates."  (*Id.* at 15).  The complainant "screamed a little bit" and Lange removed his finger and told her not to tell anyone or he would "do it again." (*Id.* at 18).  The complainant testified that she bled when she went to the bathroom.

The complainant testified that the second incident happened when she was in the first grade. She was in her father's trailer, where he lived after her parents separated.  A.L. was playing outside and went inside to use the bathroom.  Her father stepped out of the bedroom, pulled her inside, and locked the door.  He told her to pull her pants down and then he put his finger in her "privates." A.L. testified that it hurt.  Lange left his finger in for more than a minute.  (*Id.* at 22).  Lange again told her not to tell anyone.  She saw blood when she went to the bathroom.

The complainant was in the second grade when her mother took her to see Dr. Hall on October 8, 1998.  The complainant testified at trial that she initially denied that anything had

happened. (*Id.* at 23). Her mother then took her outside and again asked her if anything had happened. The complainant then told her mother about the abuse. (*Id.* at 23). The child and mother then went back inside and the complainant wrote the note telling Lacowski about the abuse. (*Id.* at 40-41). The complainant testified that she might have told Nick Canto, who worked at Scotty's House, that her father said he would spank her if she told anyone, but she did not remember her father saying that. She also told Nick Canto that she thought it happened at night, but did not remember it that way at trial.

On cross-examination, A.L. testified that she had discussed the case with prosecutors on four or more occasions, with each session lasting about an hour and a half. (*Id.* at 30). A.L. denied previously telling a psychologist, Tatia Miller, that she was afraid of her mother and wanted to live with Lange. (*Id.* at 50, 53). A.L. testified that she heard voices and saw visions of Lange for about a year. (*Id.* at 57). In 1998, the year of her outcry, A.L. was also afraid of her mother's boyfriend because he had a bad temper. (*Id.* at 69).

A.L. kept a diary during her parents' divorce. The diary and notes she wrote were admitted into evidence at the trial. (*Id.* at 102; Defendant's Exhibits 8-12). In the diary, A.L. complained about her mother physically and emotionally abusing her and her brother and sister. A.L. wrote in her diary that she wanted to live with Lange after the divorce. (*Id.* at 95).

Dr. Jennifer Welch, a clinical psychologist specializing in sexual abuse, testified that it is common for children to delay admitting that they have been sexually abused. (Reporter's Record, Vol. VI, pp. 116-17). Symptoms in sexually abused children may range from sexualized or seductive behavior such as masturbation to a drop in academic performance, feelings of depression and guilt, disruptions in relationships, withdrawal, or anxiety. It is normal for the abused child to continue to

love the abusing parent. (*Id.* at 119-20). Although some symptoms are the same as for children who go through a nasty divorce, some are different, such as seductive behavior. Dr. Welch reviewed notes from A.L.'s therapist and concluded that her problems were typical of a sexually abused child. (*Id.* at 126).

Dr. Welch also testified that if a child is asked the same question more than once, she may change a truthful answer because she assumes it was "wrong." Dr. Welch also testified that leading questions should not be asked in interviewing children. Dr. Welch reviewed the interview of A.L. by Canto at Scotty's House. Dr. Welch concluded that A.L.'s interview answers were consistent with her trial testimony. Dr. Welch acknowledged that Canto asked some potentially leading questions but pointed out that A.L. did not consistently agree with the suggested answer.

Pat Nation, a psychologist, treated A.L. from February 8, 1999 until the trial in March 2000. (Reporter's Record, Vol. VI, pp. 137-38). Dr. Nation testified that A.L. said she felt depressed because "my dad hurt me." (*Id.* at 141). A.L. told Dr. Nation about three separate finger-penetration acts by Lange, but testified at trial about only two acts. (*Id.* at 144-45). Dr. Nation testified that A.L. appeared very sad, withdrawn, anxious, embarrassed, and ashamed. A.L. told Dr. Nation that this happened to her because she was "bad." A.L. had difficulty sleeping, which caused the dark circles under her eyes, and had difficulty concentrating at school. She had nightmares in which she reexperienced the trauma, and flashbacks of the experience. (*Id.* at 145). Dr. Nation testified that A.L. had engaged in masturbation, which is typical for children who have been overly stimulated sexually. (*Id.* at 145-46). Dr. Nation testified that the complainant had shaved her eyebrows off and that such self-injurious behavior was also typical of abused children. (*Id.* at 146).

The defense presented various medical personnel, social workers, the complainant's mother, members of the Lange family, former teachers, and Lange himself. Amy Koronka, the complainant's mother, was recalled as a witness by the defense. Koronka testified that she filed for divorce from Lange on March 7, 1997. (Reporter's Record, Vol. VI, p. 170). Koronka admitted that her divorce from Lange was bitter. She sought both community homes in the divorce. (*Id.* at 180-83). She contested the final divorce decree entered on August 17, 1998, asserting that Lange was hiding assets. This was two months before A.L.'s outcry. (*Id.* at 183-90). In September 1998, a month before the outcry, Koronka reported Lange to Children's Protective Services (CPS) for physical abuse and neglect of the children. (*Id.* at 70-72). Koronka told CPS that her children were coming home injured after they visited their father. She reported a bruise on the back of A.L.'s thigh, that her son had welts on his buttocks, that Lange's home was a health and safety hazard to the children, and that he was neglecting their teeth. Koronka testified that when she asked A.L. about the bruises, A.L. gave inconsistent explanations, including that she had been hit accidentally with a football, that she had fallen off a bike, and that she had been spanked. Koronka acknowledged that when confronted by a CPS worker, A.L. retracted her accusation that Lange had spanked her. (*Id.* at 88).

After the outcry, Koronka identified her then-boyfriend and several other men, including her brother-in-law, father, and A.L.'s teachers – "every man that has ever been around" the child – as possible suspects. (Reporter's Record, Vol. VII, pp. 37-39). Koronka admitted that at first it had been hard for her to believe that Lange had molested the complainant. She testified that either her daughter told her, or she found out from someone else, that Lange had threatened to kill her or A.L. if she told about the sexual abuse. (*Id.* at 26). Koronka testified that she had fought to keep Lange's family from seeing the children because they did not believe A.L.'s accusation against Lange.

Koronka admitted that she had volunteered to provide testimony for the ex-husband of Lange's sister so that he could get his children away from Lange's family.

Tatia Miller, a psychotherapist, counseled the three children in late 1997 for emotional problems because of the pending divorce. (Reporter's Record, Vol. VII, p. 43). Miller conducted four counseling sessions with the children and detected no symptoms of sexual abuse. The children did confide in her that their mother emotionally and physically abused them, and all three wanted to live with Lange after the divorce was final. (*Id.* at 46-47, 55).

Jennifer Welch testified on cross-examination in the defense's case-in-chief. During Welch's testimony, the videotaped interview of A.L. by Canto of Scotty's House was played for the jury. (Defendant's Exhibit 2; Reporter's Record, Vol. VII, p. 89). Welch did not believe that Canto "coached" A.L. but found some of the questions leading. (*Id.* at 95). Welch thought that A.L. was "too comfortable" with Canto, noting that she giggled throughout the video. Welch concluded that this behavior "would indicate something inappropriate might have happened to her." (*Id.* at 96-97).

Jamie Ferrell, a registered nurse specializing in sexual assault cases, examined photographs Nurse Riley of Scotty's House took during the pelvic examination of A.L. in October 1998. (Defendant's Exhibits 3-5). Ferrell testified that the photographs showed no "attenuation" or damage to the hymen, because of "agglutination" (labial adhesion). (Reporter's Record, Vol. VIII, pp. 17-22). Ferrell believed that, to determine whether the hymen had been injured, estrogen cream would have to be applied to "open up the labia," which Nurse Riley had not done. (*Id.* at 25-26). During cross-examination, Ferrell stated that being present for the examination would not change her opinion because "those lips are sealed shut." (*Id.* at 30-31). However, she agreed that someone who

actually physically examined the child would be in a better position to determine the child's condition.

Lila Pace Belitz, a clinical social worker, first began to treat Koronka and her three children in March 1998 to help them cope with the divorce. Belitz was still treating A.L. when she accused Lange of the abuse. Belitz testified that in the summer of 1998, A.L. did not want to go on the usual summer visitation with her father. Belitz pointed out that children are often conflicted about which parent they prefer during a divorce. Belitz characterized Koronka's reaction to A.L.'s outcry as shock. Belitz testified that A.L. had told her that her father had digitally penetrated her. Belitz did not believe that Koronka was capable of manipulating A.L. into making this statement. Belitz also said that A.L. had explained a bruise on her leg as the result of falling off her bike, but later said that she had been hit accidentally with a football.

Dr. Roy Luepnitz, a psychologist with expertise in sexual-assault victims and offenders, testified for the defense. Dr. Luepnitz had worked under contract with eight central Texas counties to treat sex offenders. (Reporter's Record, Vol. VIII, p. 124). Dr. Luepnitz administered three tests to Lange after he was indicted to determine whether he had a sexual attraction to children. (*Id.* at 128). The tests were the Able Assessment Test (in which photos are displayed to the patient, testing their sexual interest by the length of time the subject visually shows interest in a particular photograph), the Million Clinical Multiaxial Inventory Index (a written test to detect deception), and the Minnesota Multifaceted Personality Inventory (MMPI) (a written test). Dr. Luepnitz determined from the test results that Lange was not sexually interested in children. (*Id.* at 135-137, 141; Reporter's Record, Vol. IX, p. 64). Dr. Luepnitz also administered tests designed to determine whether an individual is a "situational offender." Lange scored high on attraction to adult and

adolescent Caucasian females, which is a normal adult profile. Lange also scored high, although not abnormally, on voyeurism and exhibitionism, but Dr. Luepnitz explained that those attractions do not indicate a child molester. Dr. Luepnitz explained that the studies only identify tendencies and attractions, not whether someone actually acts on those tendencies or attractions. The tests did not put Lange in the subcategories of a situational offender. Four possible personality disorders appeared from the results - histrionic, dependent, narcissistic, and borderline. The tests indicated that Lange had a strong sense of self-importance, was indifferent and uncaring, and tended to minimize problems within himself. These personality factors were mild, not moderate or severe. Dr. Luepnitz testified that he had done psychological testing on police officers and found that they showed some of these same characteristics in their profiles. These factors did not lead Dr. Luepnitz to believe that Lange had a problem. Dr. Luepnitz added that a person is more likely to manifest these traits under stress, such as from a divorce. Dr. Luepnitz characterized Lange as minimally meeting the criteria for a narcissistic personality disorder.

Dr. Luepnitz viewed the video tape of Canto's interview of A.L. and concluded that the interview technique was biased and leading. Dr. Luepnitz cited studies showing that such interview techniques can lead to false information because children are easily influenced by adults. (*Id.* at 150-53). Dr. Luepnitz also noticed inconsistencies in A.L.'s accounts of the alleged abuse, including the location of the assaults, whether the assaults took place in the day or the night, where Lange was located in the room where the assaults occurred, and what Lange said after each episode. (*Id.* at 153-55, 161). Dr. Luepnitz also noted that the alleged acts occurred twenty months apart, with no increase in severity. (*Id.* at 169-170).

The defense recalled Pat Nation, the psychologist who treated A.L. for more than a year before trial. Dr. Nation testified that on January 12, 1999, Koronka said that A.L. told her that Lange had threatened her with a knife and said that he would cut her mother "up into little bitty pieces." (Reporter's Record, Vol. X, p. 12). During one counseling session, A.L. told Dr. Nation that Lange had been sexually abusing her as "far back as I can remember." (*Id.* at 54).

Bessie Wise, Lange's paternal aunt, testified for the defense. She described Koronka as "theatrical" and needing "chaos going on around her." (Reporter's Record, Vol. VII, p. 114). Wise testified that Koronka "would not know the truth if she met it walking down the street."

B.T., Lange's niece, testified that at her eighth birthday party on March 31, 1998, she had talked to A.L.. According to B.T., A.L. called her into the garage and said that "she and her mom were going to do something really, really bad to her dad" and that she wasn't going to be able to see B.T. and her family "for a long, long time." (*Id.* at 60-61).

Kristy Terry, Lange's sister and B.T.'s mother, believed that A.L., like her mother, was untruthful and tended to embellish and seek attention. (Reporter's Record, Vol. VIII, p. 79). Terry characterized Koronka as a vicious and vindictive woman. (*Id.* at 76). Terry and her two daughters, ages thirteen and nine, had been living with Lange for more than a year at the time of the trial. Terry was not "even a little" concerned to have Lange living with her children. (*Id.* at 79-80).

Steve Terry, Lange's brother-in-law (Kristy Terry's ex-husband and B.T.'s father), had known Lange and his ex-wife, Koronka, for years. He described Koronka as "full of crap" and a liar "[a]ll the way to the bone." (Reporter's Record, Vol. XI, pp. 15-16). Terry had no trouble with his two daughters living in the same house as Lange.

Terry Gayton, a former teacher of the Lange children at a Montessori school in Bryan in 1995 and 1996, observed that the children were always anxious to leave with Lange when he came to pick them up. Gayton said that the children would cry most of the time. Gayton described Koronka as "hateful and rude" to teachers, often raising her voice to protest some imagined problem with a teacher. (Reporter's Record, Vol. VIII, pp. 117-120). Lange was "always gentle with the children," once bringing the complainant a bouquet of flowers and his son a bouquet of balloons on Valentine's Day. (*Id.* at 120).

Christina Hausenfluke, a CPS worker, investigated a report by Lila Pace Belitz after Koronka had accused Lange of abusing and neglecting the children during their visits. Belitz told Hausenfluke that Koronka blew things out of proportion. Hausenfluke noted her concern that Koronka may have been trying to get the children to say their father had spanked them and that A.L. had said that she had not been spanked. At one point, Hausenfluke asked A.L.'s brother some questions, and he looked at Koronka to see what to say. Hausenfluke inspected Lange's home and found no safety hazards, as Koronka had claimed. Hausenfluke investigated Koronka's complaint that Lange was neglecting the children's dental health by contacting the children's dentist. Their teeth were normal. Another case worker ruled out emotional abuse or physical abuse by Koronka, although A.L. told that case worker that she was afraid of her mother.

Del Lange also testified. (Reporter's Record, Vol. X, pp. 19-20). Lange denied that he had sexually abused or done anything inappropriate with A.L. (Reporter's Record, Vol. XI, pp. 29-30). Lange testified that he did not remember asking Detective Kinard what he had to say to get probation. (*Id.* at 69-70).

Two pastors testified that Lange had a good reputation for truth and veracity. (Reporter's Record, Vol. XII, pp. 104, 111).

Dr. Scott Schams testified for the State in rebuttal. He reviewed the photos Riley took during the pelvic exam of A.L. at Scotty's House. (Reporter's Record, Vol. XII, p. 80). Dr. Schams agreed with Riley's assessment that the complainant's genital area showed signs consistent with penetration. (*Id.* at 82).

## III.   The Applicable Legal Standards

Subsections 2254(d)(1) and (2) of AEDPA set out the standards of review for questions of fact, questions of law, and mixed questions of fact and law that result in an "adjudication on the merits." An adjudication on the merits "is a term of art that refers to whether a court's disposition of the case is substantive, as opposed to procedural." *Miller v. Johnson,* 200 F.3d 274, 281 (5th Cir. 2000). The AEDPA provides as follows, in pertinent part:

> (d)  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.
>
> (e)(1)  In a proceeding instituted by an application for a  writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

A state-court determination of questions of law and mixed questions of law and fact is reviewed under 28 U.S.C. § 2254(d)(1) and receives deference unless it "was contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States." *Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir. 2000). A state-court decision is "contrary to" Supreme Court precedent if: (1) the state court's conclusion is "opposite to that reached by [the Supreme Court] on a question of law" or (2) the "state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent" and arrives at an opposite result. *Williams v. Taylor*, 120 S. Ct. 1495 (2000). A state court unreasonably applies Supreme Court precedent if: (1) it unreasonably applies the correct legal rule to the facts of a particular case; or (2) it "unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Id.* at 1495. In deciding whether a state court's application was unreasonable, a court considers whether the application was "objectively unreasonable." *Id.* at 1495; *Penry v. Johnson*, 215 F.3d 504, 508 (5th Cir. 2000).

Questions of fact are governed by § 2254(d)(2). *Martin v. Cain*, 246 F.3d 471, 475 (5th Cir. 2001). A question of fact found by the state court is "presumed to be correct . . . and [receive] deference . . . unless it 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Hill*, 210 F.3d at 485 (quoting 28 U.S.C. § 2254(d)(2)). A state court's factual findings are also entitled to deference on federal habeas corpus review and are presumed correct under 28 U.S.C. § 2254(e)(1), unless the petitioner rebuts those findings with "clear and convincing evidence." *Garcia v. Quarterman*, 454 F.3d 441, 444 (5th Cir. 2006) (citing *Hughes v. Dretke*, 412 F.3d 582, 589 (5th Cir. 2005) and 28 U.S.C. § 2254(e)(1)). This

deference extends not only to express findings of fact, but also to the implicit findings of the state court. *Garcia*, 454 F.3d at 444-45 (citing *Summers v. Dretke*, 431 F.3d 861, 876 (5th Cir. 2005); *Young v. Dretke*, 356 F.3d 616, 629 (5th Cir. 2004)).

While, "[a]s a general principle, Rule 56 of the Federal Rules of Civil Procedure, relating to summary judgment, applies with equal force in the context of habeas corpus cases," *Clark v. Johnson,* 202 F.3d 760, 764 (5th Cir.), *cert. denied,* 531 U.S. 831 (2000), the rule applies only to the extent that it does not conflict with the habeas rules.  Section 2254(e)(1) – which mandates that findings of fact made by a state court are "presumed to be correct" – overrides the ordinary rule that, in a summary judgment proceeding, all disputed facts must be construed in the light most favorable to the nonmoving party.  Unless the petitioner can "rebut[ ] the presumption of correctness by clear and convincing evidence" as to the state court's findings of fact, those findings must be accepted as correct.  *Smith v. Cockrell,* 311 F.3d 661, 668 (5th Cir. 2002).

## IV.    The Claim of Ineffective Assistance of Trial Counsel

To prevail on an ineffective assistance of counsel claim, a habeas petitioner must satisfy the two-prong test established in *Strickland v. Washington*, 466 U.S. 668 (1984).  A habeas corpus petitioner must first show that "counsel's representation fell below an objective standard of reasonableness," with reasonableness judged under professional norms prevailing at the time counsel rendered assistance. *Strickland v. Washington*, 466 U.S. 668, 688 (1984).  The standard requires the reviewing court to presume that counsel exercised reasonable professional judgment.  *Id.* at 690.  Counsel's performance is deficient only when his "representation [falls] below an objective standard of reasonableness." *Id.*  The Fifth Circuit has described that standard as "requiring that counsel research relevant facts and law, or make an informed decision that certain avenues will not be

fruitful." *United States v. Herrera*, 412 F.3d 577, 580 (5th Cir. 2005), quoting *United States v. Conley*, 349 F.3d 847, 841 (5th Cir. 2003). "A conscious and informed decision of trial tactics and strategy cannot be the basis for constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness." *Green v. Johnson*, 116 F.3d 1115, 1122 (5th Cir. 1997). A court measures reasonableness against prevailing professional norms, viewed under the totality of the circumstances. *Strickland,* 466 U.S. at 688. "Judicial scrutiny of counsel's performance is highly deferential . . . a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The Sixth Amendment does not guarantee an accused "errorless representation." *Green v. Johnson*, 116 F.3d 1115, 1122 (5th Cir. 1997) (citing *Moreno v. Estelle*, 717 F.2d 171, 176 (5th Cir. 1983)).

A habeas petitioner must also "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. He must "affirmatively prove," not just allege, prejudice. *Id.* at 693. Prejudice results when "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.*; *see also Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993) (habeas petitioner must show that trial result was unreliable or proceeding fundamentally unfair due to deficient performance of counsel). If he fails to prove the prejudice component, the court need not address the question of counsel's performance. *Strickland*, at 697. Strategic decisions by counsel generally do not provide a basis for habeas corpus relief. *See Strickland*, 460 U.S. at 689.

Lange alleges that his trial counsel's performance was deficient and prejudicial when he offered into evidence an exhibit that had an incriminating paragraph. Defendant's Exhibit 1, a twelve-page document, included the following paragraph on page six:

> Rec'd word from local agency that Del Lange (Sr.) has been charged [with] molestation of 2 female children (. . .). Due to duty to warn, informed [illegible] who sees Del's step-son @ this time.  upon conversation RE this [with] her, stated she is already aware of sit. & has been dealing [with] it.

This entry was initialed by Tatia Miller and dated April 1999. (Reporter's Record, Vol. XV, Defense Exhibit 1, p. 6).

Lange argues that no one suggested at trial that there had been any accusation of a sexual assault against A.L.'s sister.  If the State had offered such an allegation, it would have been inadmissible if objected to.  Lange complains that his counsel was deficient in introducing Defendant's Exhibit 1 without first redacting this paragraph and that it prejudiced his defense.

Defense Exhibit 1 consisted of twelve pages, including the following:

(1)     a confidential client information form from the counseling center;

(2)     a Limits of Confidentiality form;

(3)     clinic notes of Tatia Miller;

(4)     a Boike Counseling Center release of information form;

(5)     a letter dated March 16, 1998 from Tatia Miller to an attorney named Channa Borman;

(6)     Amy Koronka's authorization to release information to the Texas Department of Protective and Regulatory Services;

(7)    a subpoena for Tasha Miller[1] dated February 24, 1998; and

(8)    a subpoena for Tasha Miller dated March 10, 1998.

Lange's trial counsel provided an affidavit to the state habeas court. In the affidavit, counsel explained that he did not offer Defense Exhibit 1 for all purposes, as Lange asserts. Instead, counsel had offered Defense Exhibit 1 only in a pretrial hearing, for the limited purpose of use in that hearing. The only part of Defense Exhibit 1 counsel wanted the court to consider was A.L.'s psychological records. Counsel used notations in those records to argue that A.L. would not be traumatized if she had to testify in her father's presence. The record of the pretrial hearing is consistent with the affidavit account. Counsel never offered Defense Exhibit 1 during the trial and did not understand how it was admitted into evidence at trial. Defense counsel never intended to offer any evidence of an alleged assault of A.L.'s sister. *Ex parte Lange,* Application No. 67,650-02 at cover. Indeed, defense counsel filed a written objection to the introduction of any evidence of or reference to this extraneous offense. (Clerk's Record, Vol. I, p. 97).

The prosecutor, an Assistant District Attorney for Brazos County, also provided an affidavit to the state habeas court. He stated that before trial, the court conducted a hearing to determine if A.L. should be allowed to testify via closed-circuit television. During the hearing, defense counsel tried to show that A.L. wanted to live with her father and was not afraid of him. Defense counsel offered the psychological records because they showed that A.L. wanted to live with her father and was afraid of her mother. The trial court admitted the psychological records for purpose of the pretrial hearing only. The prosecutor believed, based on the trial transcript, that two different

---

[1]  From the record, it appears that "Tatia Miller" and "Tasha Miller" are the same person.

versions of Defense Exhibit 1 were admitted into evidence after the jury was excused, one that was complete and one that was redacted to excise the paragraph referring to the alleged abuse of A.L.'s sister. The prosecutor tried to review the original of Defense Exhibit 1, but it was not in the trial record. *Ex parte Lange,* Application No. 67,650-02 at 95-96.

The record shows that the paragraph of Defense Exhibit 1 at issue was not shown to a witness or the jury during the trial or referred to by any of the lawyers. After closing argument, while the jury was deliberating, the trial judge stated that Defense Exhibit 1 was admitted for all purposes. An effort was made to find a clean copy. It appears that, at this point, the unredacted copy of Defense Exhibit 1 was erroneously admitted into evidence. It is unclear whether the jury ever saw this copy of Exhibit 1 during deliberations.

"Even the erroneous admission of prejudicial evidence can justify habeas relief only if it is 'material in the sense of a crucial, critical, highly significant factor.'" *Porter v. Estelle,* 709 F.2d 944, 957 (5th Cir. 1983), *cert. denied,* 104 S. Ct. 2367 (1984) (citations omitted). The brief entry in the psychologist's records was the only reference in the trial to any allegation that Lange had abused A.L.'s sister. The jury heard no testimony about any such allegation. There was no reference in any other document to any such allegation. The prosecutor never mentioned it. The offending paragraph was in the middle of a twelve-page document. The prosecutor presented the testimony of A.L. in which she directly accused her father, with evidence from health-care professionals about A.L.'s physical condition, behavior, and statements. The defense presented seventeen witnesses to show that A.L.'s accusation was fabricated in response to pressure from her vindictive mother and misguided health-care professionals. The record does not show how a single paragraph in the middle

of a document, a paragraph never referred to during the trial, amounted to a crucial, critical, or highly significant factor at trial.

Defense counsel never intended to offer Defense Exhibit 1 into evidence before the jury. There is nothing in the record showing that counsel moved to introduce Defense Exhibit 1 during the guilt/innocence phase of trial. An unredacted copy of Defense Exhibit 1 was incorrectly admitted into evidence, after the evidence and arguments were over and the jury was deliberating. There was no reference to the erroneously admitted portion of Defense Exhibit 1. The error did not permeate the entire trial with obvious unfairness.

Lange raised his ineffective assistance claim in his state application. The Texas Court of Criminal Appeals denied Lange's application for state writ of habeas corpus without written order. *Ex parte Lange,* Application No. 67,650-02 at cover. Under Texas law, a denial of a habeas petition, as opposed to a dismissal, is an adjudication on the merits. *Salazar v. Dretke,* 419 F.3d 384 (5th Cir. 2005) (citing *Ex Parte Grigsby,* 137 S.W.3d 673, 674 (Tex. Crim. App. 2004)).[2] The convicting court did not recommend relief. The Texas Court of Criminal Appeals denied relief without written order. Under the AEDPA standard of review, this court cannot grant Lange federal habeas corpus relief on a claim that was adjudicated on the merits in state court, unless the adjudication of that claim either: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the

---

[2] The Texas Court of Criminal Appeals has explained the difference between a denial and a dismissal as follows: "In our writ jurisprudence, a 'denial' signifies that we addressed and rejected the merits of a particular claim while a 'dismissal' means that we declined to consider the claim for reasons unrelated to the claim's merits." *Ex parte Torres,* 943 S.W.2d 469, 472 (Tex. Crim. App. 1997).

evidence presented in the state court proceeding. *Brown v. Payton*, 544 U.S. 133, 141 (2005); *Williams v. Taylor*, 529 U.S. 362, 404-05 (2000); 28 U.S.C. § 2254(d). The presumption of correctness not only applies to explicit findings of fact but also to implied findings necessary to the state court's conclusions. *Valdez v. Cockrell*, 274 F.3d 941, 948 n.11 (5th Cir. 2001).[3] The state habeas court's rejection on the merits of Lange's ineffective assistance claim was neither contrary to, nor involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. Nor was it based on an unreasonable determination of the facts in light of the evidence presented in Lange's state habeas corpus proceedings.

Lange is not entitled to habeas relief on this claim.

## V.   The Claim Based on Prosecutorial Misconduct

Lange alleges that prosecutorial misconduct during closing argument deprived him of a fair trial. A prosecutor's comment to a jury is reversible error only if it is both inappropriate and harmful. *United States v. Lowenberg*, 853 F.2d 295, 301 (5th Cir. 1988), *cert. denied*, 489 U.S. 1032 (1989); *see United States v. Young*, 470 U.S. 1, 16 (1985). When a contemporaneous objection is made, the issue is whether the defendant's substantial rights have been prejudiced. *United States v. Fierro*, 38 F.3d 761, 771 (5th Cir. 1994), *cert. denied*, 115 S. Ct. 1388 (1995), and *cert. denied*,

---

[3] *See Marshall v. Lonberger*, 459 U.S. 422, 433 (1983) (applying presumption of correctness to implicit finding against the defendant's credibility, where that finding was necessarily part of the court's rejection of the defendant's claim); *LaVallee v. Delle Rose*, 410 U.S. 690, 695 (1973) (same); *see also Goodwin v. Johnson*, 132 F.3d 162, 183-84 (5th Cir. 1998) (findings of fact can be implied from explicit conclusions of law).

115 S. Ct. 1431 (1995).  "[T]he remarks must be examined within the context of the trial to determine whether the prosecutor's behavior amounted to prejudicial error." *Young*, 470 U.S. at 12.

"Counsel is accorded wide latitude during closing argument, and this court gives deference to a district court's determination regarding whether those arguments are prejudicial and/or inflammatory." *United States v. Palmer*, 37 F.3d 1080, 1085 (5th Cir. 1994), *cert. denied*, 115 S. Ct. 1804 (1995).  Three factors are considered to determine whether serious doubt is cast upon the correctness of the jury's verdict: "(1) the magnitude of the prejudicial effect of the prosecutor's remarks, (2) the efficacy of any cautionary instruction by the judge, and (3) the strength of the evidence supporting the conviction."

Lange raised three claims of prosecutorial misconduct on direct appeal.  The Texas appellate court rejected them based on the doctrine of invited error.  A defendant "cannot complain on appeal of alleged errors invited or induced by himself, particularly where it is not clear that the defendant was prejudiced thereby." *United States v. Raymer*, 876 F.2d 383, 388 (5th Cir. 1989) (quoting *United States v. Lewis*, 524 F.2d 991, 992 (5th Cir. 1975)) (finding invited error when defense counsel first asked on direct examination about statements the defendant made to his psychologist, after which the prosecutor asked two questions on the subject); *see also, United States v. Solis*, 299 F.3d 420, 423 (5th Cir. 2002) (finding invited error when the defense successfully moved to strike facts alleged in the indictment but argued on appeal that these facts were essential elements of the crime and had to be proved beyond a reasonable doubt); *United States v. Doran*, 564 F.2d 1176, 1177 (5th Cir. 1977) (finding invited error when the defense counsel was the first to elicit evidence of plea negotiations).

Each claim of prosecutorial misconduct is examined below.

A.     **The Prosecutor's Argument Based on his Oath to Uphold Justice**

The first claim of prosecutorial misconduct is based on the following argument by the prosecutor, "See all that reference to me spending six hours with [the complainant] doesn't mean anything unless he's alluding that I coached that witness. As a prosecutor, Ms. Muldrow (another prosecutor) and I both took an oath to uphold justice. . . . Now, he's here to defend his client. That's the only thing he's here to do." (Docket Entry No. 1, Petition for a Writ of Habeas Corpus, p. 25). Lange argues that this argument undermined the presumption of innocence, the State's obligation to prove guilt beyond a reasonable doubt, and the standards of propriety applicable to public prosecutors.

The appellate court rejected this claim, stating as follows:

> In his second issue, appellant alleges the trial court erred in overruling his objection to the improper closing argument by the State during the guilt-innocence phase of the trial, which struck at appellant over the shoulders of counsel.  The questionable argument is as follows:
>
>> The State:  See all that reference to me spending six hours with her doesn't mean anything unless he's alluding that I coached that witness. As a prosecutor, Ms. Muldrow and I both took an oath to uphold justice.
>>
>> Defense Counsel:   Striking at the Defendant over my shoulder.  We object to it.
>>
>> The Court:  Objection overruled.
>>
>> The State:  (Continuing.) Now, he's here to defend his client. That's the only thing he's here to do.
>>
>> Defense Counsel: Objection. Same objection.
>>
>> The Court:  Objection overruled.

There are four permissible areas of jury argument: (1) summation of the evidence, (2) reasonable deductions from the evidence, (3) an answer to the argument of opposing counsel, and (4) a plea for law enforcement. *Campbell v. State*, 610 S.W.2d 754, 756 (Tex. Crim. App.1980). The State may not use closing argument to strike at a defendant over the shoulders of his counsel or accuse that counsel of bad faith. *Fuentes v. State*, 664 S.W.2d 333, 335 (Tex. Crim. App. 1984).

In *Wilson v. State*, 938 S.W.2d 57 (Tex. Crim. App. 1996), the prosecutor made reference to the fact that he wished to see "that justice is done in this case" and that he had "taken a very sacred oath . . . to see that justice is done. . . ." *Id.* at 58. He also referred to the fact that defense counsel had taken no such oath and that he wishes "that you turn a guilty man free . . . and he can wish that because he doesn't have the obligation to see that justice is done in this case." *Id.* Defense counsel objected, and the trial court overruled it. On appeal, the court found the remarks to be objectionable because they were outside the record, manifestly improper, and prejudicial to the rights of the accused. *Id.* at 60. Those remarks were similar to those made in the case at bar.

However, the State argues that the remarks were invited. Under the "invited argument rule," the State may argue outside the record in response to defense argument, which has gone outside the record. *Johnson v. State*, 611 S.W.2d 649, 650 (Tex. Crim. App. 1981). During the cross-examination of A.L., the defense brought out that the Complainant had spent about six hours talking to the prosecutor. Defense counsel also asked A.L. if she had been coached on how to say things by the prosecutor, to which she responded affirmatively. Additionally, he queried her as to whether her "testimony has changed from when you gave the tape to today after spending six hours with Mr. Clark." In his closing argument, defense counsel further stated:

> Defense Counsel: . . . And, you know, they have her for six hours, these prosecutors; and I get one chance to ask her questions. They've got her six hours going over-and over this thing. You heard her talk about it. They talked about things like, well, [A.L.], you know, you said on the tape it happened at night–

The State:  Judge, I'm going to object.  Going outside the record.  He has no idea what we talked about.

The Court:  Objection overruled.

Defense Counsel:  (Continuing).  She testified in there what they talked about.  She said they talked about the fact that she said night on the tape, but here in the courtroom it's day.  I asked her, 'Well, isn't it important that it be in the day because if it was at night, you wouldn't be outside playing around–your brother and sister wouldn't have been outside playing around.  They would be inside and they could hear you scream?' . . .

If it were night, that would not have happened.  So now it's daytime here in court.  Which rendition of this do you think she had the freshest memory?

On October 9th when she talked to Scotty's–I mean, Nick Canto at Scotty's House or here in court after she spent six hours going over this case with the prosecution?

Defense counsel argued that the State had coached the witness into changing her statement.  Appellant claims that if the State found his questions to the complainant improper, the State should have objected, and that his closing remarks were not outside the record but were a reasonable deduction from the evidence.  Thus, he concludes, the prosecutor was not entitled to go outside the record in response by making reference to his oath.

The questions asked of the complainant as to the amount of time she spent with prosecutors or the subjects they talked about were not necessarily objectionable, nor were they evidence that the complainant told inconsistent stories.  Although the child responded affirmatively when asked if she was coached, there was no evidence that she understood what that meant or that the State actually acted improperly by telling the witness what her testimony should be.  It should be no surprise to anyone that prosecutors would meet with a victim to review courtroom procedure and potential testimony prior to trial.  Thus, the mere fact that the prosecutors met with the victim, without more, does not mean it is necessarily a reasonable deduction from the evidence that prosecutors have acted improperly in these interviews.  The prosecutor was entitled to reply to the argument that

the child was improperly coached and the reply argument was within permissible bounds. *See Bailey v. State*, 804 S.W.2d 226, 229 (Tex. App.-Amarillo 1991, no pet.). Moreover, moments earlier, the prosecutor referred to the fact he had taken an oath not to pervert justice, to which the only objection was that the prosecutor's personal opinion as to the veracity of the complainant was outside the record, not that the reference to the oath was outside the record. The general rule is that any error in improper jury argument is waived by the failure to make a timely and proper objection. *Cockrell v. State*, 933 S.W.2d 73, 89 (Tex. Crim. App. 1996), *cert. denied*, 520 U.S. 1173, 117 S.Ct. 1442, 137 L.Ed.2d 548 (1997). Appellant's second issue is overruled.

*Lange v. State,* No. 07-00-0348-CR., 57 S.W.3d 458, 465-67 (Tex. App. – Amarillo 2001, pet. ref'd).

A similar issue arose in *United States v. Arce*, 997 F.2d 1123, (5th Cir. 1993). In his closing argument in that case, the prosecutor stated:

> I mean, [the cooperating codefendants] could have really slam-dunked him if they were just there trying to help me; and I don't think counsel for the defense meant to say that, but I feel like I kind of need to say something about it, or if I had put them up to some type of testimony.
>
> They don't pay me enough money to try to prosecute people who I don't believe or who the evidence hasn't shown me are guilty of a crime.
>
> [Defense objection]
>
> As to [Assistant U.S. Attorney] Mr. Ray Montgomery, I have known Ray Montgomery since I started practicing law some years ago. I would be afraid–
>
> [Defense objection]
>
> THE COURT: This is argument, counsel, but let's stay within the evidence, please.

The defendant argued that the prosecutor improperly gave his personal opinion about the credibility of witnesses and the strength of the government's case.  The government contended that the prosecutor was merely responding to defense counsel's repeated insinuations during cross-examination that the prosecution had coached the codefendants' testimony.  The government also argues that any error was harmless.

The court agreed that the defense opened the door to the prosecutor's argument by implying that the government had encouraged the codefendants to testify falsely.  The court noted that defense counsel made the following comments during cross-examination of the codefendants:

> Q [to a codefendant witness]: The prosecutor hasn't told you anything about what can happen to you by you getting up here on the witness stand and saying exactly what they want you to say?
>
> Q [to another codefendant witness]:  You have spoken with the prosecutor getting ready for this case, and based on that, it's his belief that [the defendants] are guilty, and that's what he wants you to testify about, correct? . . .
>
> Q:  But it's [the prosecutor's] desire that you testify to matters that would indicate [the defendants] are guilty?
>
> [Objection sustained]
>
> Q:  The only way [the prosecutor] would think that you were lying is if you took the witness stand and said these men were not guilty?
>
> [Objection sustained].

The court concluded that the "prosecutor obviously was responding to the defense's suggestions that the government had coached its witnesses." Because the prosecutor's remarks were "invited," and did no more than respond substantially in order to "right the scale," they did not warrant reversing the conviction. *United States v. Arce*, 997 F.2d at 1129-30.

In the present case, defense counsel asked A.L. on cross-examination how many times she spoke to the prosecutor; how much time she spent with defense counsel; why she was laughing when she left the earlier pretrial hearing; whether she had spoken to other prosecutors; whether she spoke to police officers; whether her mother was present during interviews with the prosecutor; the number of people she spoke to about the assault; and whether she discussed the details with her mother. (Reporter's Record, Vol. VI, pp. 31-49).   The cross-examination included the following exchange:

> Q.   By the way, did you and the prosecutor talk about the voices and visions you have during one of those six hours worth of meetings?
>
> A.   I don't really remember.
>
> Q.   Did ya'll talk about that today or yesterday?
>
> A.   No.
>
> Q.   Okay, did you meet with them today in preparation for your testimony?
>
> A.   With who . . . [the ADA]?
>
> Q.   Yes.
>
> A.   Yes.
>
> Q.   Did you meet with him yesterday?
>
> A.   No. Wait. Yes.
>
> Q.   And you–all talked about how you were going to testify today; is that right?
>
> A.   Yes.
>
> Q.   Okay.  And he coached you on how to say things, didn't he?
>
> A.   Huh?

Q.     He kind of told you how to say things when you get asked
       questions, right?

A.     Yes.

Q.     Told you about a bunch of things?

A.     Yes.

Q:     Getting you ready to talk to me, wasn't he?

A.     Yes.

Q.     And you–all, again, went over the whole thing again, didn't
       you?

A.     Yes.

Q.     You talked about each and every little bitty pieces of the
       story, didn't you?

A.     Yes.

(Reporter's Record, Vol. VI, pp. 57-59).

    Counsel's questions during cross-examination were designed to show that A.L.'s testimony

was the product of hours of coaching by the prosecutor.   Counsel implied that the prosecutor

addressed the minutest details to present a coherent story before the jury.   Counsel further suggested

that the prosecutor helped A.L. change her story about when the first incident took place.   During

her videotaped interview at Scotty's House, A.L. stated that the assault took place at night.   At trial,

she testified that it took place during the day.   Defense counsel argued that A.L.'s testimony was

false and that the prosecutor had instructed her how to testify.   The prosecutor's argument was

invited and did no more than "respond substantially, in order to right the scale."   Under the Fifth

Circuit standard, reversing the conviction is not warranted.

**B.     The Prosecutor's Argument that the Complainant Fooled Twelve People**

Lange also asserts that the prosecutor improperly argued, over objection, that if A.L. was lying, she had fooled at least twelve people, including him and the other prosecutor, the Bryan police, Nick Canto of Scotty's House, Jane Riley, and other witnesses who were knowledgeable about sexual abuse. (Reporter's Record, Vol. XII, p. 89). Trial counsel objected to the personal opinion of the prosecutor. The objection was overruled. (*Id.* at 90). Lange argues that the effect of the prosecutor's argument was to instruct the jury that he and his co-counsel were paid to prosecute guilty people and would not be in court presenting witnesses if the complainant was lying. Lange argues that this sent jurors the message that all State officials and witnesses connected to the case vouched for the credibility of the complainant.

The appellate court rejected this claim, stating:

> Appellant also objects to the State's closing argument in his third issue, alleging the prosecutor interjected his personal opinion regarding the veracity of the alleged victim. This portion of the closing argument, the subject of appellant's second issue, which immediately preceded the argument under appellant's second issue, is as follows:

>> [The State:]  You also have to believe that if [A.L.] is lying that she's capable of sustaining that lie for 15 months and fooling all these people, Nicole Lacowski, Detective Stautzenberger, of the Bryan Police, the first person to take the report, Nick Canto at Scotty's House, Jane Riley at Scotty's House–

>> Defense Counsel:  Objection–

>> The State:  Detective Kinard–

>> The Court:  Do I have an objection?

>> Defense Counsel:  Could we approach the bench?

The Court:  You may.

Defense Counsel:  There's a list up there of about 12 different people that he's saying that she's fooled.  Now, the implied in that, Judge, is that all of these people have the conclusion that she was molested and it was Del.  There's been no testimony of a number of these names as far as them reaching any conclusion.

To put the prosecutor's name up there is a personal opinion by him that the child has been–

The Court:  I don't think that evidence is before the jury.  The objection is overruled.

Defense Counsel:  I would like to get a couple of these charts admitted, Judge, for a bill at some point, if I could.

The Court:  All right.

The State:  (Continuing.)  Nicole Lacowski, when she first out-cried, Stautzenberger, Bryan Police, took her over to Scotty's House, Nick Canto at Scotty's House, Jane Riley at Scotty's House, Detective Kinard talked to her afterwards, Lila Belitz who was a counselor, the prosecutors, and finally you.  Because I took an oath and I resent his allusions that I'm trying to do a perversion of justice–

Defense Counsel:  Judge, now that–

The State:  –in coaching that witness.

Defense Counsel:  There's no evidence of that.

The State:  It's invited argument, your Honor.

Defense Counsel:  I object to that as outside the record, what his personal opinion is about this case.

The Court:  Objection overruled.

The gist of the argument is that, because the prosecutor's name was included in a list of people that the victim had to fool if she was lying,

he was offering his personal opinion that the victim told the truth and also implying that the other witnesses believed the victim was truthful. When the prosecutor attaches a personal belief to the credibility of a witness, the effect is to bolster the credibility of the witness with unsworn testimony, which is improper. *Robillard v. State*, 641 S.W.2d 910, 912 (Tex. Crim. App. 1982). It has also been held error to suggest to the jury that they should defer to any other person's assessment of the truthfulness of a witness, no matter how experienced that person may be. *Gardner v. State*, 730 S.W.2d 675, 698 (Tex. Crim. App.), *cert. denied*, 484 U.S. 905, 108 S. Ct. 248, 98 L. Ed.2d 206 (1987). However, if the State's argument falls within one of the four permissible categories previously enumerated, it does not constitute error. *Johnson v. State*, 987 S.W.2d 79, 84 (Tex. App. - Houston [14th Dist.] 1998, pet. ref'd). Remarks of counsel must be considered within the context of the entire argument. *Gaddis v. State*, 753 S.W.2d 396, 398 (Tex. Crim. App. 1988); *Kelly v. State*, 18 S.W.3d 239, 244 (Tex. App. - Amarillo 2000, no pet.).

In contending the argument was proper, the State relies on *Wylie v. State*, 908 S.W.2d 307 (Tex. App. - San Antonio 1995, pet. ref'd), in which the defendant, who was convicted of aggravated sexual assault of a child, raised a claim of ineffective assistance of counsel because his attorney failed to object to jury argument in which the prosecutor attempted to uphold the credibility of the child complainant and inferred that the child had "convinced" a number of witnesses. Because the defense strategy was to attack the complainant's credibility by suggesting she had a tendency to fabricate and was influenced by the prejudices of others, the arguments of the State were found to be a response to the defense and reasonable deductions from the evidence. *Id.* at 310.

In *Kelly*, the prosecutor made the statement he would "put every bean I have got on Mathew Jackson" in response to argument from defense counsel that the witness had misidentified the defendant. We found that the State's argument was a response to defense counsel's argument and also a reasonable deduction of the evidence in light of testimony from the witness of four separate opportunities he had to observe the defendant. *Kelly*, 18 S.W.3d at 244-45.

Similarly, in *Richards v. State*, 912 S.W.2d 374 (Tex. App. - Houston [14th Dist.] 1995, pet. ref'd), the prosecutor argued that ". . . the only person who testified completely truthfully in this case and did not make a single mistake was Bernard Phearse. He is the only person in

my opinion." *Id.* at 379.  The court noted that the defense strategy was to disprove the complainant's credibility by implying the testimony was influenced by others, particularly the prosecutor.  The court concluded that the statement was not an improper attempt to bolster the testimony because it was a reasonable deduction from the evidence and a summation of the evidence.  *Id.* at 380.

Defense counsel attempted during the trial and closing argument to attack the complainant's credibility by showing inconsistencies in her story and that she had been manipulated by others into bringing the allegations.     During   cross-examination,   she   was   specifically questioned as to each person she had spoken to about the alleged incidents, including the prosecutors.  The State's response was to attempt to demonstrate consistency in her story by referring the jury to those witnesses to whom she had relayed the incidents.  The prosecutor never directly stated that he believed the complainant.  He stated that if the jury believed she was lying, they also had to believe that she had fooled the witnesses who testified at trial as to her version of the events.  The prosecutor also included himself as one of the persons the complainant would have had to fool.

Similarly, in *Wylie*, two of the witnesses mentioned did not testify at trial, but because their names were brought out in the testimony of other witnesses, it was a reasonable deduction from the evidence for the prosecution to refer to them again.  *Wylie*, 908 S.W.2d at 310.  In this case, although the prosecutors were not witnesses, the complainant was questioned regarding her discussions with the prosecutors about her allegations.  In light of the defense argument that the complainant had been influenced in her testimony by others, including the prosecutor, we believe the prosecutor's statement was a proper response to that argument.     Appellant's third issue is overruled.

*Lange v. State,* No. 07-00-0348-CR., 57 S.W.3d 458, 467-69  (Tex. App. -- Amarillo 2001, pet.

ref'd).

Courts recognize that the prosecutor's statements of belief in the credibility of witnesses can

be prejudicial.  The Supreme Court has stated:

The prosecutor's vouching for the credibility of witnesses and expressing his personal opinion concerning the guilt of the accused

> pose two dangers: such comments can convey the impression that
> evidence not presented to the jury, but known to the prosecutor,
> supports the charges against the defendant and can thus jeopardize the
> defendant's right to be tried solely on the basis of the evidence
> presented to the jury; and the prosecutor's opinion carries with it the
> imprimatur of the Government and may induce the jury to trust the
> Government's judgment rather than its own view of the evidence.

*United States v. Young*, 470 U.S. 1, 18-19 (1985).

Courts also recognize that when, as here, a prosecutor makes such a statement, it is important to place the statement in context. In *United States v. Gracia*, 522 F.3d 597 (5th Cir. 2008), the Fifth Circuit stated:

> The government urges us to put the prosecutor's remarks in the
> context of counsel for Gracia's earlier innuendo that the agents were
> less than forthcoming. We agree that the magnitude of the prejudicial
> effect of the prosecutor's remarks should not be weighed in a
> vacuum, and we recognize that the trial record contains statements by
> counsel for Gracia indirectly implying that the agents might not be
> altogether truthful. In reference to one of the agents, counsel for
> Gracia noted in his closing argument that "even when we[ ] . . . have
> no incentive to lie, it's human nature . . . . You're a witness for the
> government. You tend sometimes to recall things a little differently"
> (Record at 487). Soon after, Gracia's attorney re-emphasized this
> the-agents-are-lying theme: "And sometimes even after they [the
> agents] take an oath in court to swear to tell the truth, they still say
> something that was not true. And they'll swear by it, but it wasn't
> true." (*Id.* at 488). Later in his closing argument, Gracia hammered
> home his assertion that the agents were not telling the truth: "I'm just
> telling you that people who testify sometimes testify to what they
> think they remember, but it's not what they remember." ( *Id.* at 490).
>
> Thus, the prosecutor's attempts to vouch for the agents' credibility
> should be seen as a response to Gracia's effort to discredit the agents.
> We weigh the magnitude of the prejudice resulting from the
> prosecutor's obviously improper statements in this context.

*Gracia*, 522 F.3d at 602-603.

Applying these precedents to the present case leads to the conclusion that the prosecutor's comments do not warrant the relief Lange seeks. The defense theory was that the complainant's allegations against Lange were fabricated and the product of coaching by her mother, health-care professionals, and the prosecutor. Defense counsel argued that the testimony from Lange's family members showed that Amy Koronka was a vindictive person and was manipulating A.L. to get back at her ex-husband. (Reporter's Record, Vol. VI, pp. 152-53; Vol. XII, pp. 36-37). Defense counsel argued that when Koronka failed to obtain a lucrative divorce settlement, she accused Lange of mistreating the children, and when the initial report to CPS proved unsuccessful, she escalated to having A.L. accuse Lange of sexual assault. Defense counsel argued that A.L. was afraid of her mother, influenced by hours of counseling, and coached by the prosecutor on what to say to convict Lange. Defense counsel argued that the complainant loved her father and "[i]f she's in here now saying she's scared of her dad, doesn't want to live with him, it's because of one thing: Amy Lange Koronka and all the time she spent with these psychologists, 50 hours of having it repeatedly drilled into her head." (*Id.* at 57). The prosecutor objected on the ground that this misstated the psychologist's testimony. The objection was sustained. Defense counsel then argued that the psychologist repeatedly told A.L. that her father did something bad to her and that she needed to "heal." Counsel argued that this type of therapy can lead to a false allegation. (*Id.* at 59). Counsel argued that A.L.'s accounts of the alleged abuse did not ring true because of the numerous inconsistencies.

In his closing argument, the prosecutor responded to the charge that he, A.L.'s mother, and her psychologist had worked with A.L. to fabricate her testimony about Lange's abuse by listing the many people to whom A.L. had given her account of the sexual abuse. Those people included:

Nicole Lacowski; the Bryan Police; Nick Canto at Scotty's House; Jane Riley at Scotty's House;
Detective Kinard; Lila Belitz, a counselor; and the prosecutors.  The prosecutor stated that the
account of events A.L. gave the jury was the same as those she had given consistently for fifteen
months to a number of different people.

Reviewing the prosecutor's comments in light of the entire record and the case law leads to
the conclusion that the comments were not error. The prosecutor was responding to the defense
counsel's questions of witnesses and statements that A.L.'s accounts had been fabricated and the
repeated lies encouraged by her mother, her psychologist, and the prosecutor. Any error was invited.
Even if the comments were error, the magnitude of the prejudice does not warrant the relief sought.
The trial court properly instructed the jury that the lawyers' arguments were not evidence.
(Reporter's Record, Vol. II, pp. 9-10). There was strong direct evidence against Lange: A.L. testified
that her father sexually assaulted her on two occasions; the State presented evidence that her physical
condition was consistent with the assaults she described; and the State also presented evidence that
her behavior was consistent with being sexually abused. The alleged prosecutorial misconduct
during closing arguments did not deprive Lange of a fair trial.

### C.    The Prosecutor's Argument that Defense Counsel was Trying to Distract the Jury from the Truth

Lange alleges prosecutorial misconduct in the argument that defense counsel was trying to
divert the jury from the truth.  The argument included the following:

> Well, ladies and gentlemen, I think we can all agree that there's a lot
> of different defenses you can throw out; but there's only one truth.
> And they've thrown out a lot of different defenses. And you can ask
> yourself: Do they really intend for us to follow all these defenses?
> Did they argue them all the same? Can they all be true, or are they
> really just an effort to distract us from the truth?

(Reporter's Record, Vol. X, pp. 74-75, 77).

Lange argues that the prosecutor's statements urged the jury to ignore defense counsel's legitimate role as an advocate, discharging as important a responsibility in representing Lange as the prosecutor had in representing the State. Lange argues that this "verbal assault," challenging defense counsel's integrity as a lawyer and asserting that he would divert the jury from its truth-finding function, undermined the process and sent the jurors a "powerful message" that State officials are truth-tellers while defense counsel subvert the truth.

The appellate court rejected Lange's claim, stating as follows:

> In his fourth issue, appellant attacks the trial court's overruling of his objections to the State's argument that he attempted to divert the jury from the truth. Appellant cites us to two separate occurrences in the record. The first exchange was as follows:

>> The State: Well, they can hardly smear a 7-year-old can they? I mean, it would be ludicrous to try to smear a 7-year-old. So they do the next best thing. They find the closest person to the victim, and they do their best to drag her down into the mire. And the hope is that it can generate enough dust and smoke–

>> Defense Counsel: Objection, Judge–

>> The State: –from the truth of this case.

>> Defense Counsel: Same objection.

>> The State: Judge–

>> The Court: Objection overruled.

> The second exchange occurred shortly thereafter:

>> The State: (Continuing.) Well, ladies and gentlemen, I think we can all agree that there's a lot of different defenses you can throw out; but there''s only one truth. And they've thrown out

a lot of different defenses. And you can ask yourself: Do they really intend for us to follow all these defenses? Did they argue them all the same? Can they all be true, or are they really just an effort to distract us from the truth?

Defense Counsel: Objection. Same objection, Judge.

The Court: Objection overruled.

The State: (Continuing.) Let's talk about some of these rabbit trails.

Defense Counsel: Objection. Rabbit trails again. Same objection.

The Court: Objection sustained.

Defense Counsel: Ask for instruction to disregard.

The Court: Jury is instructed to disregard.

Defense Counsel: Move for mistrial.

The Court: Denied.

The State: (Continuing.) The first of these so-called offenses–so common prosecutors have an acronym for it–some other dude did it. And Mr. Bryan appears to have abandoned that in his closing argument. During the trial there were allusions to Allen Hickman and there were allusions to Jerry. There were allusions to his friend, Brian. Fortunately, we could clear that up when he took the stand; and there's other people that could have done that.

And the Defendant's actions indicate that there's no other person that did it. Imagine a father falsely accused and believing that his daughter at least might have been molested–

Defense Counsel: Judge, got "rabbits" written at the top of his chart: and that is case law and specifically held that that is improper. We object.

The Court:  The jury has been instructed to disregard that comment.

Defense Counsel:  Could we have the chart taken down or at least that part of it, Judge?

The Court:  No.  The jury has been instructed to disregard it. Ladies and gentlemen, you'll abide by my instructions.  Do you understand that?  Very well.

Appellant contends that this argument was an uninvited accusation of improper conduct on his part.  As we noted in *Howard v. State*, 896 S.W.2d 401 (Tex. App.-Amarillo 1995, pet. ref'd), it is important to differentiate between comments which facially appear aimed at defense counsel but actually strike at his argument.  *Id.* at 405. Counsel runs the risk of improper argument when it is made in terms of defense counsel personally and explicitly impugns his character. *Mosley v. State*, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998), *cert. denied*, 526 U.S. 1070, 119 S.Ct. 1466, 143 L.Ed.2d 550 (1999).  In *Howard*, the State analogized the defense tactic to a "bunny trail" and charged defense counsel with presenting false issues, but it did not charge the defense with actually manufacturing false evidence. *Howard*, 896 S.W.2d at 405.  We held that given its brevity, its *de minimis* derogatory content, and its direct relationship to the defendant's argument, the statements were permissible.  *Id.*

Furthermore, in *Beasley v. State*, 864 S.W.2d 808 (Tex. App.-Fort Worth 1993), aff'd, 902 S.W.2d 452 (Tex. Crim. App. 1995), the prosecutor argued that the jury could see through the "clouds of smoke screen" presented by the defense.  Because the argument was made in response to argument by defense counsel that tried to place emphasis on the character of the victims rather than the acts of the defendant, the argument was found to be a proper response.  *Id.* at 812.  In *Gonzales v. State*, 831 S.W.2d 491 (Tex. App.-Houston [14th Dist.] 1992, pet. ref'd), the prosecutor's reference to "bunny trails" and "rabbit trails" was also held to be a response to argument of defense counsel that the theft had been completed before flight and the exhibition of a knife, thereby constituting a separate offense.  *Id.* at 494.

During closing argument, defense counsel here had asserted that the Complainant's mother was bitter about her divorce, was trying to get back at appellant and his family and she had manipulated

her daughter into making false accusations. There was also trial testimony that the Complainant had been alone with other males who may have had an opportunity to assault her. We therefore believe that the State's argument was in response to defense counsel's closing argument and evidence presented at trial. Moreover, even assuming the references to "rabbit trails" were improper, reversible error is shown only if substantial rights have been affected. *Mosley*, 983 S.W.2d at 259. In making that determination with respect to improper argument cases, courts generally look to the severity of the misconduct, measures adopted to cure the misconduct, and the certainty of conviction absent the misconduct. *Id.* In this instance, the State did not charge that defense counsel had manufactured evidence and the court sustained the objection to the use of "rabbit trails" and instructed the jury to disregard it, as well as the chart where the phrase appeared. While the veracity of the complainant was hotly contested at trial, given the mild effect of the conduct and the court's instruction, we do not believe reversible error occurred. Appellant's fourth issue is overruled.

*Lange v. State,* No. 07-00-0348-CR., 57 S.W.3d 458, 69-71 (Tex. App. – Amarillo 2001, pet. ref'd).

The state court's analysis is consistent with federal law. In a case raising similar issues, *United States v. Bernard*, 299 F.3d 467 (5th Cir. 2002), the defendant claimed that he was denied due process and a fair trial by the prosecutor's repeated inappropriate comments in his closing argument to the jury. The Fifth Circuit rejected this claim, reasoning as follows:

During his closing argument to the jury, the prosecutor stated:

But because the investigation was so thorough, it did not leave either be [sic] these Defendants or their attorneys with anything to work with. You heard the evidence. You heard the corroboration. You saw the physical evidence and the scientific evidence. . . . It left them with nothing, because the evidence is so overwhelmingly and so positive and so true as to the guilt of both of these Defendants for the crimes they've been charged with.

So, what were they left to do? Defense Counsel were left with the opportunity-with-with nothing, so they had to try to create a doubt where one did not exist. And [defense counsel]

> spent, for the last hour to hour and a half, trying to convince
> you any way they can, any possibility, no matter how remote
> or extreme it would be, to try to get someone on this jury to
> follow down a rabbit trail and take a red herring and somehow
> say, "Oh, I've got a doubt." Not based on facts, but based
> purely on conjecture and speculation. Ladies and gentlemen,
> if these guys had another hour, they'd be trying to convince
> you it's midnight outside right now.

> The prosecutor continued to argue that defense counsel made up an
> "outrageous theory" out of desperation in an attempt to mislead the
> jurors. Vialva contends that the prosecutor's statements amount to an
> improper personal attack on defense counsel, denying Vialva a fair
> trial.
> . . .
> The prosecutor's arguments, properly understood, attacked the
> strength of the defense on the merits, not the integrity of defense
> counsel. Moreover, the prosecutor had some latitude because the
> defense counsel accused the government of "paying for" some of its
> witnesses. Finally, the court instructed the jury twice not to consider
> the statements, arguments or questions by the attorneys as evidence.
> Given the strength of the prosecution's case against Vialva, these
> remarks could not have denied him a fair trial.

*United States v. Bernard*, 299 F.3d 467, 487-88 (5th Cir. 2002).

In *United States v. Gamez-Gonzalez*, 319 F.3d 695 (5th Cir. 2003), defense counsel objected

to the government stating in the rebuttal portion of its closing argument that "[t]he Defense's job is

to blow as much smoke towards the jury box as they can, confuse things." The district court

implicitly overruled this objection by allowing the prosecutor to "specify what he mean[t] by

'smoke.'" The defense lawyer claimed that the remark about "blowing smoke" was reversible error

because it suggested that defense counsel was trying to mislead the jury and vouched for the

credibility of the government's case. Rejecting this claim, the Fifth Circuit stated:

> Obviously, the remark was extremely unprofessional and otherwise
> inappropriate. Nevertheless, it constitutes reversible error only if it
> is "so improper as to affect [Gamez's] substantial rights". *United*

> *States v. Vaccaro*, 115 F.3d 1211, 1215 (5th Cir. 1997), *cert. denied*,
> 522 U.S. 1047, 118 S. Ct. 689, 139 L. Ed.2d 635 (1998).
> . . .
> Following the remark, the prosecutor explained that, by "smoke", he
> was referring to the defense's theory of the case. And, immediately
> after the Government's closing argument, the court instructed the jury
> to base its verdict "solely upon the evidence without prejudice or
> sympathy" and that such evidence did not include "any statement,
> objections, or arguments that the attorneys made". In this light, and
> considering the evidence of Gamez's guilt, there was no reversible
> error.

*United States v. Gamez-Gonzalez*, 319 F.3d 695 (5th Cir. 2003).

In the instant case, the prosecutor's arguments, in the context of the record, attacked the

strength of the defense on the merits, not the integrity of defense counsel. *United States v. Mares*,

402 F.3d 511, 516 (5th Cir. 2005), *cert. denied*, --- U.S. ----, 126 S. Ct. 43 (2005) (holding that the

prosecutor's comment that defense counsel "wants [the jury] to get lost behind a file of smoke" was

not improper); *United States v. De La Rosa*, 911 F.2d 985, 991-992 (5th Cir. 1990) (finding that the

prosecutor's statements – that defense counsel "miscorrectly [sic] stated the evidence again" and "I

don't know what . . . trial [defense counsel] was watching but it wasn't this one," – did not constitute

personal attacks on the character and integrity of defense counsel). And, as in *Bernard*, the

prosecutor was accorded some latitude because the defense counsel accused the prosecutor of

coaching the complainant.

Finally, even if the prosecutor's statements were improper, either individually or considered

as a whole, the prejudicial impact did not "cast serious doubt on the correctness of the jury's verdict"

or affect Lange's substantial rights. *Virgen-Moreno*, 265 F.3d at 290. The trial court instructed the

jury that attorneys' comments are not evidence and that the jury should base its decision solely on

the evidence admitted in the case.  The State presented substantial evidence of Lange's guilt.  No reversible error occurred.

Lange is not entitled to habeas relief on this claim.

**VI.    Conclusion**

The respondent's Motion for Summary Judgment, (Docket Entry No. 17), is granted. Lange's petition for a writ of habeas corpus is denied.  This case is dismissed.  Any remaining pending motions are denied as moot.

Under the AEDPA, a petitioner must obtain a COA before appealing the district court's denial of habeas relief.  28 U.S.C. § 2253(c)(2).  "This is a jurisdictional prerequisite because the COA statute mandates that '[u]nless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals . . . .'"  *Miller-El v. Cockrell*, 537 U.S. 322 (2003)(citing 28 U.S.C. § 2253(c)(1)).  "The COA statute establishes procedural rules and requires a threshold inquiry into whether the circuit court may entertain an appeal."  *Id.* (citing *Slack v. McDaniel*, 529 U.S. 473, 482 (2000); *Hohn v. United States*, 524 U.S. 236, 248 (1998)).  A COA will be granted only if the petitioner makes "a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  To make such a showing, a petitioner "must demonstrate that the issues are debatable among jurists of reason; that a court could resolve the issues [in a different manner]; or that the questions are adequate to deserve encouragement to proceed further."  *Barefoot v. Estelle*, 463 U.S. 880, 893 n.4 (1983) (citation and internal quotation marks omitted).  Lange has

not made "a substantial showing of the denial of a constitutional right." A certificate of appealability is not issued.

SIGNED on September 18, 2009, at Houston, Texas.

_____
Lee H. Rosenthal
United States District Judge